and others, and Brian Cook. Argument is not to exceed 15 minutes for plaintiff, and 15 minutes to be shared by the defendants. Mr. Kolinik for the appellant. Good morning, your honors. I've reserved three minutes for rebuttal. This is a civil rights case alleging excessive force by Deputy Sines and a failure of duty to intervene, failure to intervene to stop that excessive force by Trooper Cook. Plaintiff Mr. Kelly was intoxicated on the evening in question in a passenger in a vehicle being driven on Interstate 71 between Columbus and Cincinnati. This is early in the morning, about 3 a.m. Traffic was light as would be expected. Trooper Cook of the Ohio Highway Patrol stopped the vehicle since it was weaving lane to lane and obviously there was a problem with the driver. Eventually he pulled the driver out of the car and arrested the driver for driving under the influence. This necessitated law enforcement contacting the plaintiff, Mr. Kelly, because he was the passenger in the car and they couldn't just leave him there by the side of the road. It's important to note that Mr. Kelly was not committing any crime at this point in time. He was being contacted for his own safety. Public intoxication, at least in that circumstance, being legal under Ohio law. Trooper Cook contacted Mr. Kelly. He attempted to wake him up and Mr. Kelly didn't wake up immediately. He was groggy and he began throwing his arms up in the air, probably under the impression that his buddy was messing around with him. Trooper Cook backed out of the vehicle and at that time Deputy Signs, who had arrived to back up Trooper Cook, these men were patrolling in sort of a remote area of Ohio so different agencies backed each other up. Deputy Signs ran up to the side of the car, the passenger side, ripped open the door, grabbed a hold of Mr. Kelly and began yelling, show me your hands, show me your hands. At that point one of the officers states, we know you're asleep, this is the police, show us your hands or something to that effect. In very quick succession, Deputy Signs, who has his taser already deployed, his taser is in one hand, he's grabbing Mr. Kelly with the other, pulls Mr. Kelly from the vehicle or attempts to. Mr. Kelly is still seat belted in the car. At that point, if you watch the video or the discussion by the district court, he is flailing around a good bit, is he not? His arms are flailing around, yes sir, but we view that a little bit differently than the defense. Since he's flailing around, he's stuck in his seat belt, he's still stuck in the lap belt at the time and Signs is looking, this is Deputy Signs, directly at him as he runs up to the car. Obviously he's a police officer, he's going to contact this man, his focus is on that man, his eyes are on him. That lap belt is visible the entire time and both hands are visible that Signs is approaching the car. So you're saying, are you emphasizing or arguing that that's a genuine issue of material fact as to whether he saw the seat belt? Yes sir, we believe a reasonable jury could conclude that Signs is not telling the truth when he says he didn't know this man was seat belted in the car and that is before the first taser incident. Assuming that he is at least flailing around and his intentions or his motivations at that point are not known, what was it that Signs should have done? Just backed off and closed the door? No sir, I mean obviously Signs approached the car in the first place to back up Trooper Cook who had backed out of the car specifically because of that flailing of the arms. Obviously a police officer can interpret this as assaultive behavior. No, the police certainly do not have to back away at that point. They are required in fact by law to get this citizen under control and protect him from his own drunkenness in this particular case. But at the same time, prior to using a taser, the citizen, even intoxicated, has to have some opportunity to comply with an order. And I guess the classic case on that is Cockrell where the person saw a policeman and took off running and the court ultimately concluded that there was no constitutional violation or at least it wasn't clearly established on the date in question because he was running. He wasn't complying with the policeman who was chasing him, even though the policeman hadn't said stop or given him any warning at all. I guess the running itself, while the policeman is chasing you, constitutes sufficient notice that the policeman wants you to stop. And a lot of cases have been more explicit on that point. Well here, giving you the benefit of the doubt here on the seatbelt, he isn't really complying otherwise. I mean, he's giving him the show me your hands and he isn't really doing that either, is he? His hands were visible, as is clear from the video. And I don't think the defense ever alleges. You can't say he was complying though, would you counsel? Are you arguing that? You can't say he's complying at the time his hands are flailing around, no ma'am. He's clearly not complying. At the same time, this happened so quickly that signs grabbed him without much. He grabbed him and starts pulling him without much attempt to get him to do anything. This is the police show us your hands at the same time he's grabbed and being pulled. The man's just waking up. He's incapable of complying with anything. So be that as it may, we're not complaining that signs grabbed him and pulled him. The idea though that Kelly is grabbing the fellow and pulling him, knowing that he's seatbelted in, that's a waste of effort, isn't it? Why would he engage in that? Well, this gets to, you know, you have to see the witnesses to know what they're doing. I've been at this for a few years now, suing policemen. It's not what I went to law school to do, but that's how it goes. And before that, as a student working for lawyers in Cleveland, Ohio, I've never deposed a policeman before that scared me for the safety of my wife and children. This is not a bright officer. He would very happily waste time and be inefficient. He's not an officer anymore. I believe he drives trucks now. Of all the policemen I've deposed, whether he's being efficient and doing things that make sense, he's the least likely one to have that be useful for him. Nevertheless, yes, if he, why is he grabbing the man, pulling him out at the same time he's shouting if he knows he's in the seatbelt? Yes, he's hurting all this effort against a seatbelt. At some point, the lap belt comes off and he just wants to get the guy out of the car. And it's all bottled up in the same incident. His arms are flailing, signs, the deputy grabs him and his arms are now reacting to being pulled. And signs gets him a good way out of the car. His feet are on the ground and even at one point his feet and his hands are both on the ground. Signs is still pulling him and if you look at the plaintiff, and obviously he's not here to show the court, he's not a large individual. Whereas signs is a fully grown individual and weighs well in excess of 200 pounds in the video. He should have had no difficulty moving this young man, one hand or not. The guy's down on the ground and then he does come all the way up. Signs lets him go at some point because he can't get him out of the car. And part of our case is that a reasonable officer should know at that point. And again, they're not worried about being assaulted. They're not worried about a weapon or any of the things a police officer has to deal with. Is it arguable that they're worried about the traffic? They did argue that, but if you look at those officers, and these are two veteran officers, these are not rookies, they don't pay any attention to that traffic during this incident. Signs never looks, or if he does, it's just for a split second. And Cook looks later. When he comes around, he's got his back watching all this stuff, and then eventually he looks over his shoulder to see if any cars are coming. It's not in the record, but that behavior is inexplicable. If there's some curve in the road or something where they can't see around it, they probably could see a good long way. I give you credit on that because when I watched it, I was struck by how nonchalant they were. Now, that's not to say there was no traffic. It's an interstate and it's a legitimate argument. You see traffic go by, but they seem to be... They believe that the people aren't going to get them. Of course, people do get killed that way, but they didn't seem concerned. The officers weren't worried. But when you're hollering at a guy, get on the ground, you've actually got him on the ground, pretty much on the ground. He could have stayed there. His popping up certainly is not very compliant. Not compliant, but yet wholly the fault of the seatbelt. He was pulled back by that seatbelt and was moving away from signs before the first taser strike. And we think that's quite significant. In the deputy's explanation of why he did this, he claims that the plaintiff leapt out of the car and attacked him. And we think nothing is further from the truth than that statement, if you watch the video and give the plaintiff credit. Obviously, we're sort of doing a lot of, if not fact-finding, fact-observing here. And given that our standard of review here is, or the standard of law, that could any reasonable officer have thought that what he did was constitutional? Well, and it may have been bad judgment. It probably was bad judgment. But given that you're dealing with a person, you know, split-second, all that sort of stuff, he does come, you know, get him on the ground, and he does come up, however aggressively or unaggressively, in contravention of what he's trying to do. I mean, isn't that really the issue, that this is not bad judgment on this guy, is that could any reasonable officer have thought that it was valid? If he thought reasonably that he was being attacked, then clearly he can deploy his taser, obviously. Do they have to be attacked, or do they have to fear that an attack is, there's a potential for that? I believe that fear is sufficient, Your Honor. Or mere resistance, even if he doesn't fear being attacked, mere resistance to a lawful command even is arguably sufficient, and I think is fairly well established, at least in this circuit, that's sufficient. And I don't think as a practitioner that we could credibly argue against that. The police have a job to do. They have to be allowed to do it. We want them to do it. And they have to not be in jeopardy. Well, not only not in jeopardy, but not be disobeyed. Even better, right. What we're saying is that there was no reason for him to fear being assaulted here, that it was unreasonable for him to think even that he was being disobeyed in his commands. There was no real opportunity to comply until that snap back, and at that point the taser hits him in the eye, and he's blind now in that eye. He had no opportunity to comply, and the only order being given, show us your hands, show us your hands, and then trying to force him to the ground. I mean, this whole thing is very physical, and what we're saying is that the officer was not justified in this action in this circumstance, not as a blanket proposition that they can never lay their hands on a man in this circumstance. But in the facts in this video, there was no reason to be trying to throw him to the ground and then proceed to the taser, not just back up and say, what is wrong with this idiot? He's not advancing on the police officer at the time the taser is actually deployed, at the time the dart went through. Your key observation or your key point, you put it as it was unreasonable for this officer or any officer in this situation to think that he was being disobeyed or resisted. Is that really the key? That is correct, Your Honor, yes. And I don't think we hit disobeyed so much in the brief as much as resisted, but that's true, yes. I'm very short on time at this point, Your Honors. We didn't talk about the trooper at all. As to the first tasing, that heavily depends on his admission that he saw the red dot on the man's back. And as to the second tasing. You really had very little time. I mean, it seems to me your better argument is that for science's unreasonableness is that Cook looked pretty reasonable. Right. At least to this judge. Cook didn't tase anybody. In contradistinction to science, Cook is extremely professional. I believe he's been promoted to sergeant since then. All right. You'll have your time for rebuttal. Thank you, Your Honor. Good morning. I'm pleased to court Aaron Glasgow here on behalf of the appellees. I would like ten minutes and the State would like five minutes. All right. I guess I would go directly to one factual issue that I think needs to be clarified. I think a lot of what the appellant's case is based on is the idea that Deputy Signs immediately dragged Mr. Kelly out of the car. This really was an escalation of a response. When you approach the car, I think the only thing you can't see, the only portion of this interaction that you really can't tell what's going on, is when Deputy Signs initially reaches into the car because his arms, you know, Kelly's in the car and you can't see what he's doing with his arms. The only evidence that we have about what he is doing is Deputy Signs' testimony that he was actually trying to restrain Mr. Kelly in the car. He was pushing on him. He was trying to keep him in the truck. That is entirely consistent with everything else that he has said about this stop, which is that he was trying to keep Mr. Kelly, who's intoxicated and flailing, possibly have tried to assault a police officer, trying to calm him down and keep him in the car away from traffic and away from himself, at an arm's length away from himself. And he said that the only reason that this altercation spilled out is because his hand slipped off because Mr. Kelly was struggling against him. Now, we never claimed that Mr. Kelly... Yeah, Deputy Signs testified that basically, I think he said he had this fist on his shoulder that he was trying to... He grabs his clothing though. Well, that's my point. There is about a two- or three-second period, if you watch the video, where you just see Deputy Signs struggling, his arms going up and down. And what he's testified to, which has not been contradicted at all, is that he put his fist into Mr. Kelly's shoulder to restrain him in. And then because Mr. Kelly was struggling, that slipped off, and they both came out. Now, we're not claiming that Mr. Kelly leapt out. Mr. Kelly testified he had no recollection at all. I'm sure he wasn't really trying to do anything. He was drunk. He was very drunk. I think he was high. He didn't know what he was doing. But physically, what we have evidence is that their metamorphism pushed him out, and then Deputy Signs took the opportunity to grab his big hoodie that he has on and pull him down, which would be the most efficient way to get him under control. As Judge Cook, as you said, it would be very contradictory for Deputy Signs to know that he's belted in, know it should be physically impossible to do that, but attempt it anyway. When does he first start hollering, get on the ground? I think as he approaches and he puts his fist into his shoulder, I think he says, show me your hands. As I recall, he doesn't say get on the ground until they're out of the truck. His first command to get on the ground is when they're out of the truck. So the notion that this was either, and they've argued this, and I think I heard this here, that this was somehow passive resistance. I mean, if you watch the video in real time, it's good to watch it both ways. In real time, you can see how this is the classic immediate split-second judgment that we're always talking about with qualified immunity analysis. And this took about a minute 20 from, I think, the point that Trooper Cook was in the compartment until it was done. And, I mean, there's not a lot of time for making distinctions that they're saying he should have made about his size, his level of intoxication, things like that. What they know is they've got a very struggling, aggressive, violent person. He said it could be construed as assaulting. Just for me, Cook is the guy that is initiating the arrest. Cook backs out. There's something going on, but Cook isn't agitated. Cook doesn't look like he's in fear. And then Sines comes charging up. I don't know whether he wants to be a hero or what, but that's what initiates it. I mean, Cook doesn't seem to be worried about the flailing, other than that he doesn't want to interact with him at that point. Right. Well, you know, I don't think… Did Sines ever say why he comes charging up on the traffic side there? I can't recall whether he was asked that question or not, but if we're going to speculate about what they're thinking, obviously you could say that Trooper Cook was nonchalant, if that's what we're going to call it, because he knew he had backup. He knew he had somebody standing there that was going to address this situation. He's not standing there. He's somewhere off camera. I mean, right, he comes charging out of the field of view from at least some distance behind the bumper. He's not part of the car. Yeah, the testimony is that he was standing watching the driver who was handcuffed in the front. Yeah, and I think he said he was envying the console of the cruiser that the trooper had. And I think this is in the record that he was concerned, and I think you can certainly make the inference that he should be concerned, that Mr. Kelly was going to exit the vehicle and his next step is into the fast lane of 71. I mean, directly, you know, everybody's been on 71. You know what that's like in daytime when the trucks come flying by and they shake your car. Certainly at night, that's only heightened. And I do agree to a certain extent that they look like they're doing their job, and they are not standing there looking over their shoulder to see what's coming. I don't think they'd be doing their job very well if they had one eye continually to see what traffic is. That's a known risk to police officers on the interstate. But they have testified that that was one of their concerns. And as a matter of fact, once the scene is cleaned up, I think in the conversation that Trooper Cook has with Mr. Kelly, he says, we don't get paid to get hit. Let's move off here. We don't get paid to get hit. Now, you can't discount that concern. And that concern, this court has expressed in, I believe, the Sandell case when the gentleman was naked running on 75, got tased 37 times for the reason of keeping him away from the cars. I mean, I think that's a major component to this case. Had this happened, had Mr. Cook pulled off on the other side of the road where Mr. Kelly would have spilled out into a cornfield, it might have been kind of a different situation. But that wasn't what happened, and there was a real concern there for the traffic. As to the other cases, you know, this court has had an opportunity to look at taser cases quite a bit in the last five or six years. We've listed those cases in the briefs. And each one of them has a component. The cases we've cited, I'm not going to list each one of them because you're well aware of them, but each one of those cases has a component that you have in this case. Hightower says, you know, subjective intent is not really as important, is not important if the flailing around would give an officer a reasonable feeling that you're resisting. That's exactly what happened here. Whether it was because Mr. Kelly was intoxicated or not, certainly flailing around, certainly. I mean, he struck Mr. Kelly several times as he was trying to pull him down. And that's one thing that's hard to see unless you slow it down. But he strikes Deputy Sines several times as he's trying to pull him down to the ground, strikes his arm, which is assault on a police officer. The Kai case, the very recent Rudliff case, talks about intoxicated, volatile behavior being a justification for tasering. I certainly have that here. And the case that was decided just last month in Pennington v. Terry said that you can tase, it is justified to tase a person to keep them from a greater harm. In that case it was to stop a person from ingesting drugs. I think there was also evidence of destruction issue there. But one of the holdings was, look, this guy's going to OD. We tased him so he wouldn't take the drugs and OD. Same situation here. It seems counterintuitive somewhat to tase somebody not to hurt them so they don't harm themselves. But that really is what is going on here. So obviously the state law claims go as well as the federal claims do. I do want to point out the plaintiff or the appellant argued, I believe, for the first time, that this is a situation of an exigent circumstance that was created by the police. That was never briefed in the ñ that was never argued or briefed below. So I don't believe that is an argument that they can make here on the first time. But even if they could, that exigent circumstances doctrine, that comes from a warrantless entry search case. I've never seen that applied in an excessive force case like this one. And even if it were, I think from the video it's pretty clear that the person that escalated the situation that created this was Mr. Kelly when he swung at the trooper and then when he resisted Mr. Deputy Signs. Finally, I would say, because my time is running short, this notion that he wouldn't ñ that Deputy Signs would not know or should have known that Mr. Kelly was still belted in. First of all, there's no evidence that he subjectively knew. That seems to be the key point. Counsel started with that to say we think he's lying. Yeah, right. And that's an issue of fact. Well, there's really ñ there's no ñ I mean, he subjectively testified he wasn't aware of that. Obviously the trooper didn't know that because they were both ñ Yeah, he is. And then there's just ñ there's basic facts that we can infer reasonably. It's dark outside. He was ñ Mr. Kelly was wearing a hoodie that completely covered ñ he's a thin individual. It completely covered ñ he admitted that it completely covered his belt. He came completely out of the car. Most people that are belted in can't come completely out of the car and stand on their two feet. And he didn't tell them he's belted. He didn't ñ a reasonable person in that situation would say, I'm belted, I'm stuck. He doesn't know where he is. He can't speak. Right. Well, again, but that's the situation we're dealing with. The court did say, which would give you a second string, that even if the reasonable officer would have seen the lap belt, that wouldn't alter the analysis, which may be a stronger argument because the first one does sound more like a factual issue, even if the facts would lean in your direction. Right. And we, of course, do. But we do agree with the trial court that that is the case, that he was still a resistant person that was ñ you know, he was out of the car. He was resisting. But Deputy Sines was being pushed back into that lane of traffic, so we agree with the trial court on that. So I thank you for your time. I'll split the time. Jameson. Thank you. May it please the court, Peter Jameson, Assistant Ohio Attorney General, on behalf of Ohio State Highway Patrolman Sergeant Brian Cook, the appellee. Sergeant Cook is entitled to qualified immunity because the taser took place too quickly for him to perceive an excessive use of force, presuming one even occurred, and it's certainly too quickly for him to intervene in any meaningful way. Mr. Kelly asked the district court to find Sergeant Cook liable based on a theory that he failed to intervene. To successfully demonstrate that an officer has failed to intervene, the plaintiff must prove that the officer observed or had reason to know that excessive force was being used or would be used, and the officer had both the opportunity and the means to prevent the harm from occurring. The district court did not find, of course, that Deputy Sines' action constituted excessive force, and without that finding, Sergeant Cook cannot be found liable for something that didn't actually take place. Even assuming arguendo, though, that you could find that Deputy Sines' actions were an excessive use of force, Sergeant Cook would still be entitled to qualified immunity. As to the first point, the first prong of the test, whether he had reason to know, as the court found, this entire action took place over a course of 80 seconds, and that's from roughly the time that Sergeant Cook went to the vehicle to try to rouse Mr. Kelly until the time that all conflict ceased and the situation was well in hand. Now, the actual tasing took place over the course of approximately between 10, maybe 15 seconds, as it was revealed in the lower court in the facts that every time you fire the taser, it runs for five seconds, and that's in the record. By the plaintiff's account, it took about 17 seconds. That was not enough time. This court has repeatedly held that in cases, particularly when a taser is involved, that there's not enough time for the individual who could have intervened to perceive that something is going on as some sort of threat. We spent the better part of the last 20 minutes arguing over whether or not there was an excessive use of force. Well, Sergeant Cook only had a few seconds to even perceive that something was happening, let alone that it would be considered force that was excessive. That just wasn't enough time for him to get there, to see that it was, even if it were. Now, when it comes to the second point about opportunity to intervene, during the first tasing, according to the tape, Sergeant Cook was on the driver's side of the vehicle making his way around, and he certainly was not in a position at that time to intervene. During the second time, the tape is not entirely clear exactly when the tasing took place, but at that time, as we've said repeatedly, it was 3 in the morning, it was dark, it was also Memorial Day weekend, and I sincerely doubt that Mr. Kelly and his friend were the only ones who were on 71 a little intoxicated. By the time Sergeant Cook got to that side of the vehicle, he was trying to figure out what was going on with Kelly, what was going on with signs, what was going on with traffic, and there wasn't enough time for him to see that anything bad was going on, that it might have been excessive for the taser to be used a second time, or certainly enough time for him to intervene in any meaningful way. Throughout most of his brief in this argument, plaintiff and plaintiff's counsel have taken the tape apart several times, they've run through it, and it's easy when watching a tape repeatedly to second guess, try to see what's going on, maybe he should have done this, maybe he should have done that. Sergeant Cook didn't have the opportunity to watch the tape. He didn't have the opportunity to know what was going to go on when he walked up to that truck. He had to make split-second decisions and try to perceive events as if it took place in real time. He didn't know what the final outcome was going to be. That's the reason that we have the legal analysis that we enjoy for failure to intervene, and that's why the district court's decision should be upheld. Do you have any questions? Thank you. Thank you. Mr. Lenach, you have your time for rebuttal. Thank you, Your Honor. As to signs, it's manifestly unreasonable for this man to testify, I was trying to push him into the car when that entire tape shows him pulling him out of the car into the traffic lane. That's an important part of our case, and we certainly hope we'll be allowed to present that to a jury because we think they'll burst out laughing at a minimum. He was pulling him out of the car the whole time he was in contact with him.  Obviously, conceptually, just because you're seat belted in doesn't mean you can't attack a police officer or resist a police officer. That bare fact alone is enough. The testimony, counsel tells us, is that he was holding him in, so the quarrel is he's falsely testified there. Correct. He says I'm trying to push him in, yet everything he does is pulling him out. That's a data point that a jury can consider. There was an explanation offered by counsel that when his hand slipped, then they came spilling out, so to speak, I think. They're already out. Is it so clear to you on the tape that it would have been to the district court? It's extremely clear on the tape. The court obviously looked at it differently. Is there two ways to look at it in which event? Well, if there's two ways to look at it, both of which are reasonable, then summary judgment is inappropriate. But it's more than that. His sweater is being pulled when they're out of the car. That hand doesn't slip until much later than what signs are saying. If, indeed, it slipped, he didn't just release him, which is what it appears to me. In most qualified immunity cases, one could argue that a jury could have found against the person given qualified immunity if the issue was so clear, then summary judgment, not summary judgment based on qualified immunity, would have been the appropriate relief. The fact that another outcome might have been preferable is really underlying all qualified immunity cases. So that's really the problem I have. You listen to the discussion that's gone on here, and it's really kind of a jury argument that you're making on the thing. And it's sort of the language that the Supreme Court has used relative to the granting of qualified immunity is very strong. They're very protective of the types of decisions that the police officers have to make. Yes, sir, and we want to be clear that we're admitting that if that officer reasonably believed that he was being assaulted or in danger of being assaulted or even being disobeyed in an unreasonable fashion in the giving of a legal command by the citizen, the taser use was reasonable, constitutional, and lawful, and he's not even in need of qualified immunity. I'm out of time, Your Honor, so I'll let the brief take it from there. Thank you, Eric. Thank you, counsel. The case will be submitted. The clerk may call the next case.